228 So.2d 62 (1969)
Ted KOGOS
v.
Louis J. RITTINER, Joseph W. Nelkin, and Irwin, Seelig & Nelkin.
No. 3761.
Court of Appeal of Louisiana, Fourth Circuit.
July 31, 1969.
On Rehearing November 3, 1969.
Writs Refused January 20, 1970.
*63 Tucker & Schonekas, Russell J. Schonekas, James Foley, III, New Orleans, for plaintiff-appellee.
Zelden & Zelden, Sam Monk Zelden, New Orleans, for Louis J. Rittiner, defendant-appellant.
Jorda S. Derbes, New Orleans, for Joseph W. Nelkin, defendant-appellant.
*64 Before HALL, BARNETTE and GARDINER, JJ.
BARNETTE, Judge.
This is a suit for damages by Ted Kogos against Louis J. Rittiner and Joseph W. Nelkin arising out of the alleged illegal intrusion into and the taking over of plaintiff's seafood business in the City of New Orleans. The alleged taking over and ultimate virtual destruction of plaintiff's business was accomplished through an alleged false representation of the existence of a partnership between Kogos and Rittiner, upon which Rittiner, represented by his attorney Nelkin, obtained an ex parte court order appointing Rittiner liquidator of the alleged partnership on June 9, 1964. Sometime thereafter plaintiff regained possession and control of the business and brought this suit against the defendants for the damages caused by their alleged illegal action. The case was tried before a jury which returned a verdict in plaintiff's favor against the defendants in solido for $135,000. A remittitur of $25,000 was ordered and judgment was duly entered for $110,000. The defendants have appealed devolutively.
We will first dispose of the issue of partnership. The plaintiff began his seafood business about March, 1961. His father had been in business before his death and there was some measure of goodwill and reputation of "Kogos Seafoods" upon which plaintiff began to rebuild the business. His progress was slow due to the want of sufficient operating capital. By the latter part of 1962, Kogos foresaw the potential increase in his business by the introduction of additional capital in order to handle and carry large credit accounts. He made application for a Small Business Administration loan and was about ready to consummate such a loan when he was approached by the defendant Louis J. Rittiner who allegedly volunteered to lend him $15,000.
Kogos emphatically denied that there was ever any discussion between him and Rittiner about a partnership or an interest in the business in consideration for the alleged loan until in May, 1964, when Rittiner came in his place of business to borrow $150, saying that he was in need of that sum. A cancelled check payable to "Jimmy Rittiner" in that amount, dated May 22, 1964, was filed in evidence. Kogos then testified:
"When I gave him the check he folded it, put it in his pocket and said, `All right, I will be in every week to get my $150.00 a week.' I said `For what?' He said `I am a partner in this business. You get $150.00 a week; I will be in every week to get mine.' I was stunned. I said `How can he be a partner in my business?' I went home that night and talked to my wife and she said * * *."
A week or ten days later (about June 1) Rittiner returned, according to Kogos' testimony, and asked him to go to the bank and sign "partnership papers" to which Kogos refused. His testimony continued:
"A We went outside. He kept emphasizing he was a partner in my business. He said, `I will tell you what I am going to do. I am going to get even with you. I am a very vindictive man. I don't care if it takes all the money I got, all the people I know, I will break you. Your family will be out in the street. You will lose your home and your business. You will be out on the street. You won't be able to get a job in the City of New Orleans.'"
A few days later (June 9 about 3:30 p. m.) Rittiner, accompanied by his attorney Nelkin, appeared at Kogos' place of business and informed him that Rittiner had been appointed liquidator of the alleged partnership and allegedly "took over" the business.
*65 The defendants have made an attempt to treat this suit for damages as a suit for accounting and have strenuously argued that there must be a liquidation of the partnership before one partner can seek an accounting from the other. They argue that the partnership liquidation proceeding No. 424066 on the docket of the Civil District Court for the Parish of Orleans has not been concluded and that any action for accounting is premature. They cite and rely upon several cases and further argue that the partition of the assets of the partnership is governed by the same rules as the partition of successions and hence not triable by a jury, citing LSA-C.C. arts. 1290, 1293, 2890; LSA-C.C.P. art. 1733; and Bickham v. Pitts, 185 La. 930, 171 So. 80 (1936).
We find no fault with the authorities cited but they have no application except where first there exists a partnership. The existence vel non of a partnership is a fact question. If the contract of partnership is established, its interpretation and legal implications present questions of law. To determine if the parties have so contracted we turn to the following articles of the Civil Code:
"Art. 2801. Partnership is a synallagmatic and commutative contract made between two or more persons for the mutual participation in the profits which may accrue from property, credit, skill or industry, furnished in determined proportions by the parties."
"Art. 2802. It may be made by all persons capable of contracting."
"Art. 2803. It is regulated by the rules laid down in the title: Of Conventional Obligations, in all things not differently provided for by this title."
"Art. 2805. Partnerships must be created by the consent of the parties."
Whether the parties have in fact consented to a partnership, especially in the absence of any instrument in writing, is a proper question for jury determination when such question is incidental to a suit for damages triable before the jury.
The issue of fact which must be resolved first is whether the $15,000 was a loan or an investment by Rittiner for a partnership interest in the business.
Rittiner and the Kogos family had been friends for some years and Mrs. Kogos at one time had a partnership agreement with Rittiner in an interior decorating business. Rittiner obtained a loan from National Bank of Commerce of $15,000 and gave Kogos his check for that amount. Kogos attributed Rittiner's alleged voluntary offer of the loan to the friendly relationship which had existed between them. Kogos testified that he and his wife were discussing the requirements of the Small Business Administration loan and had planned to meet them. He testified this plan was abandoned "when Mr. Rittiner offered to lend me the money." He testified that no strings were attached to the loan and that "he walked in my market, gave me his personal check and said `Make sure you pay this every month.'" He said Rittiner made some boastful remarks about having plenty of money and wanted to do this as a favor. Kogos said it was strictly voluntary and he promised repayment at the rate of $600 per month with interest. This was early in January, 1963.
There is no evidence that a note was given by Kogos to Rittiner, nor is there any written evidence to indicate that the $15,000 was intended for any purpose other than a loan.
Kogos' testimony is corroborated with cancelled checks filed in evidence showing the payment of $600 plus interest, regularly, beginning February 4, 1963, through May 29, 1964; a total of 17 payments prior to the alleged "take-over" on June 9, 1964. All of these checks were made to Louis J. Rittiner except one to the National Bank of Commerce. On the checks payable to Rittiner was written: "bank note & interest"; *66 "bank note"; "note"; "loan"; "bank note loan"; or similar indications of purpose. On two additional and separate checks for interest only are the notations, "interest paid on note" and "interest on note."
After the money was put in the business until June 9, 1964, the date of the alleged "take-over," the gross sales did increase and the business was showing increased net profits. Gross sales for the first five months of 1965 were $144,000 as compared with $126,000 for all of 1962. It is conceded by Kogos that Rittiner was instrumental in securing some new accounts which in part accounts for the increase in gross sales. Rittiner's assistance in this respect would seem to be consistent with his professed interest in his friend Kogos' success and not necessarily indicative of a proprietary interest. As a matter of fact other friends also were instrumental in securing new accounts.
Whatever contribution Rittiner made by way of securing new accounts and his apparent concern for the success of the business is not inconsistent with the actions of one, particularly a longtime family friend, who has made a $15,000 loan to a small business enterprise. If for no other reason the security of the loan was dependent upon its success.
It is true that Rittiner made more frequent visits to Kogos' place of business after he made the loan and on those occasions assumed liberties and inquired of certain business transactions. This annoyed an employee, Mrs. Vivian Murphy, who on one occasion asked Kogos: "Why does he have to come in here and look at the books?" To which Kogos answered: "He has as much interest in here as I do." There was no other conversation or discussion of Rittiner's connection with the business with Mrs. Murphy or any other person at any time. Defendants place great emphasis on the foregoing testimony of Mrs. Murphy in their attempt to prove the existence of a partnership.
A capital investment is not immediately withdrawn but is left in the business to earn dividends which may either be left to increase the capital or withdrawn as profits are earned and divided. The payments made by Kogos and accepted by Rittiner were wholly inconsistent with Rittiner's claim of having invested capital for a share of the business. There is not a scintilla of evidence that Rittiner ever received or requested a share of the profits or an accounting thereof. All income tax returns and occupational licenses pertaining to Kogos Seafood represented it as individually owned by Kogos. All circumstances clearly corroborate Kogos' testimony that it was a loan and not an investment for an interest in the business.
The trial judge very properly instructed the jury that it must first answer "yes" or "no" if there was a partnership between Kogos and Rittiner and if their answer was "yes" to proceed no further in their deliberations. The jury's answer was unanimous in the negative. It then properly proceeded with its deliberation of the remaining issues.
The jury's finding of fact that no partnership ever existed between Kogos and Rittiner is so thoroughly supported by the evidence that it does not raise the slightest doubt in our minds.
We now address ourselves to the remaining issues.
On June 4, 1964, the defendant Nelkin, acting as attorney for Rittiner, wrote 11 identical letters by certified mail to customers of Kogos Seafood. In substance the letters informed the respective addressees that a suit to dissolve the partnership between Kogos and Rittiner was being filed and that an injunction would be sought preventing Kogos' collection of accounts receivable. The addressees were requested to withhold payment pending notice of injunction.
*67 On June 9 a proceeding was filed in the Civil District Court for the Parish of Orleans, entitled "LIQUIDATION OF PARTNERSHIP BETWEEN LOUIS J. RITTINER AND TED KOGOS, DOING BUSINESS AS KOGOS SEAFOOD," No. 424066. On that date Nelkin, acting as attorney for Rittiner, presented the petition to the Honorable Clarence Dowling, Judge of Division B of the court, and obtained an ex parte order signed by him appointing Louis J. Rittiner "administrator" of the partnership and directing the issuance of letters upon complying with requisites of the law and giving bond of $15,000.
Judge Dowling testified that he remembered signing the order and that he did so because Mr. Nelkin represented to him that it was agreed upon by all parties, otherwise he would not have signed it. He said he did not read the petition carefully, but examined it only to see what it was about and relied on Mr. Nelkin's representation that it was by consent.
Mr. Nelkin testified emphatically that he made no representations to Judge Dowling beyond those in the petition. He said he told Judge Dowling that he hoped the differences between Kogos and Rittiner could be resolved amicably.
After obtaining the order from Judge Dowling, Nelkin and Rittiner went immediately to Kogos Seafood on Adams Street. Kogos' version of the events which then transpired were related as follows:
"A Mr. Rittiner, Mr. Nelkin walked in my place of business at 3:15 or 3:30 in the afternoon. Mr. Nelkin walked forward and presented himself, introduced himself and said he was Joseph Nelkin representing Louis J. Rittiner and he had a court order and he had a paper in his hand and Mr. Rittiner was taking over my business and started running my business since it was in liquidation and would I please leave the premises."
Kogos testified that no officer of the court was present and he was not served with papers and that when he reached out for the paper which Mr. Nelkin was holding, and which was represented as having been signed by Judge Dowling, that Nelkin "pulled it back." Kogos was permitted to telephone his lawyer cousin, a Mr. Mansour, in Alexandria to ask his advice. He let Nelkin explain the situation to Mansour and overheard Nelkin say: "I don't care what Mr. Kogos does, he can go across the street and operate, but not here." Nelkin promised to mail copies of the petition and court order to Mansour. Then upon the telephone advice of Mr. Mansour, Kogos surrendered the business to Nelkin and Rittiner and left the premises.
The evidence is conclusive that this encounter was on June 9, which both Rittiner and Nelkin in separate briefs filed in this court give as the date of their trip to Kogos Seafood and Kogos' surrender of the business to them. Thus it is obvious that they took control of Kogos Seafood before filing oath and bond and eight days before formal issuance of letters of administration.
Shortly thereafter Kogos filed an intervention in the liquidation proceeding denying the allegations and obtained an order for a rule to show cause why the appointment of Rittiner as liquidator should not be vacated. The rule was set for hearing on July 3, 1964. In the meantime Kogos had incorporated his business and secured from his landlord a lease to the corporation of the premises occupied by the seafood business. He then took physical possession and changed locks on the door. Rittiner and Nelkin sought to enjoin Kogos from interfering and obtained a temporary restraining order. The rule for injunction was set for hearing also on July 3. A rule for contempt for Kogos' alleged violation of the restraining order was also set for the same time. On July 3 a judgment was *68 rendered in the liquidation proceeding as follows:

"JUDGMENT
By consent.
Present: Joseph W. Nelkin, attorney
 for Louis J. Rittiner
 James E. Courtin, attorney
 for Ted Kogos
IT IS ORDERED, ADJUDGED AND DECREED that the rule herein filed June 24, 1964 be made absolute and, accordingly let there be judgment herein recalling and setting aside the order appointing Louis J. Rittiner on June 9, 1964 and recalling and setting aside the Letters as Administrator signed June 17, 1964;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the rule for a preliminary injunction and the rule for contempt be continued indefinitely."
Notwithstanding the vacation of his appointment as liquidator, Rittiner continued with Nelkin's assistance in their attempts to collect accounts receivable due Kogos Seafood. As evidence of Nelkin's participation in these efforts are copies of 11 letters from Nelkin to Kogos' customers bearing dates September 8 and 9, 1964, requesting checks in payment of the accounts to be made to "Kogos Seafood" and mailed to him. Nelkin seeks to justify these acts by saying that when the "consent" judgment was entered on July 3 vacating the appointment of Rittiner, it was verbally agreed with Kogos' then lawyer, James E. Courtin, that all receipts would be held jointly until the liquidation could be settled. Courtin was not called to testify, and on cross-examination Rittiner disclaimed knowledge of any agreement for the consent judgment on July 3.
A check in the amount of $585 from "Thunderbird" (a Las Vagas account secured by Rittiner) payable to "Kogos Seafood" was received by Rittiner after his dismissal as liquidator. It was endorsed "Louis J. Rittiner, Liq. Ted Kogos Seafood" and was applied to payment on Rittiner's personal note at the National Bank of Commerce. A check in the amount of $1,500 dated July 1, 1964, by Vieux Carre Restaurant payable to "Kogos Seafood" was similarly endorsed and used by Rittiner for his personal account. Incidentally Frank Cimini, manager of Vieux Carre Restaurant, a disinterested witness, testified that he did not know Rittiner until July 1 when he came to get the Vieux Carre check and at that time Rittiner solicited Vieux Carre's business for Ferrara Seafood, a competitor of Kogos.
On April 29, 1965, Rittiner filed a purported final account in the liquidation proceeding but not until he had been compelled to do so by order of the court on Kogos' motion and then, after a rule for contempt for failure was made returnable on April 30. On cross-examination on the trial of this case he acknowledged certain errors in that account which he has taken no steps to correct. Kogos filed opposition to the account and apparently no further action has been taken in that proceeding.
John Sehrt, a certified public accountant, was called to give expert testimony in behalf of Kogos. He verified and discussed an audit prepared by him showing discrepancies in Rittiner's account. Among the items included in an alleged total shortage of $9,390.94 is one of $3,946.41 representing Kogos' funds used to pay Rittiner's personal notes. His audit also discloses a net profit of $8,673.81 from January 1 to June 12, 1964, and a net loss of $7,168.80 from July 2 to December 31.
Sehrt testified that he used accepted procedures in the accounting profession and projected an estimated loss of $36,913.99 for the period July, 1964 through May, 1965. He explained that his omission of the month of June was because of the abnormal business operations during that month in 1964.
*69 John W. Connelly, a certified public accountant, was called to give expert testimony on behalf of Rittiner. He had examined Rittiner's purported final account and came to the conclusion that it was incorrect in certain respects and that it should have revealed a shortage of $495.84. He acknowledged that some items for which he allowed credit to Rittiner were based on information given by Rittiner and unsupported by vouchers. Relative to the projected loss estimated by Sehrt, Connelly testified that he had never made projections with respect to anticipated future losses. When asked specifically if he agreed with Sehrt's formula of projection, he answered: "Mr. Sehrt is entitled to his opinion the same way I am entitled to mine." He said he would consider other factors than those apparently considered by Sehrt in making a projection.
The evidence convinces us that Kogos did suffer serious financial loss and damage to his business reputation and credit rating as a result of defendants' unwarranted actions. He was unable to pay an accumulation of obligations to creditors, including a claim for unpaid income tax. An equity of approximately $15,000 in his home taken by expropriation for Interstate Highway 10 was wholly lost to seizing creditors.
At the time of the trial below he was trying to rebuild his business and credit rating and was operating on a small scale, buying and selling seafoods in small quantities and making deliveries in his mother's automobile. This, in our opinion, is proof sufficient to justify some award of damages for mental anguish, humiliation and inconvenience.
In addition to the general defenses pleaded, defendant Nelkin predicates his defense largely on the theory that this is a suit for "malicious prosecution" arising out of the liquidation proceedings. He requested special charges to the jury on malicious prosecution damage suits against attorneys. The trial judge charged the jury fully on the subject and substantially as requested by Nelkin.
Finally Nelkin insists that he was in good faith and represented Rittiner in a manner befitting his professional duties to his client and that Rittiner's malice toward Kogos, if any, and his misrepresentation of facts, if any, should not be imputed to him. Accordingly he seeks a third-party judgment against Rittiner in event he should be cast in damages to plaintiff.
We recognize the fact that a suit for damages arising out of a "malicious prosecution" is not limited to criminal prosecutions, but may also result from civil actions. There are involved in this suit certain elements which would be present in a malicious prosecution suit, but there are other elements which go beyond the events directly involved in the civil action complained of.
The authorities cited by defendant Nelkin on this subject are thoroughly sound and generally recognized. The test applied to determine liability in such cases was stated by our Supreme Court in Eusant v. Unity Industrial Life Ins. and Sick Benefit Ass'n, 195 La. 347, 196 So. 554, 556 (1940), and applied in later cases as follows:
"`An action for maliciously putting the law in motion lies in all cases where there is a concurrence of the following elements: (1) The commencement or continuance of an original criminal or civil judicial proceeding. (2) Its legal causation by the present defendant against plaintiff who was defendant in the original proceeding. (3) Its bona fide termination in favor of the present plaintiff. (4) The absence of probable cause for such proceeding. (5) The presence of malice therein. (6) Damage conforming to legal standards resulting to plaintiff. * * *' 38 Corpus Juris 386, section 5.
This court in the early case of Barton v. Kavanaugh, 12 La.Ann. 332, held that the plaintiff must not only prove malice, *70 but must also show that there was no probable cause for the prosecution. Both must concur. This rule of law has never been deviated from * * *."
The Court further stated in Eusant at p. 556 that:
"It is the settled jurisprudence of this court that `"Where a party has communicated to his counsel all the facts bearing on the case of which he has knowledge, or could have ascertained by reasonable diligence and inquiry, and has acted upon the advice received honestly and in good faith, the absence of malice is established, the want of probable cause is negatived, and the action for malicious prosecution will not lie;" * * *.'"
See also Barfield v. Marron, 222 La. 210, 62 So.2d 276 (1952); Cox v. Cashio, 96 So.2d 872 (La.App. 1st Cir. 1957).
As stated above the trial judge charged the jury on the proper application of these principles of law. It was the jury's function to relate them to the facts found on the evidence submitted. The jury did so and returned a unanimous verdict against the defendants in solido. There was one negative vote only on the quantum of the award. The third-party demand of Nelkin against his codefendant Rittiner was dismissed also by unanimous verdict. From the evidence in the record before us on this appeal we find no reason to disturb this jury's findings of fact on these issues.

The plaintiff itemized his damages as follows:
"A. Worry and inconvenience $ 15,000.00
 B. Mental Anguish 15,000.00
 C. Humiliation and embarrassment 15,000.00
 D. Damages to business 15,000.00
 E. Damages to reputation 15,000.00
 F. Loss of income 35,000.00
 G. Attorney's Fees 25,000.00
 _________
 TOTAL $135,000.00"

Notwithstanding the judge's specific charge that the item of attorney's fees could not be allowed, the jury's verdict was for the full amount prayed, $135,000. It was reduced by remittitur of the $25,000 item as stated above, and judgment for $110,000 was duly entered.
Obviously the plaintiff has suffered substantial damage in the area of mental anguish, but we are unable to distinguish items A, B and C. The words employed in these three items are to some extent synonymous and in the context used are mere amplifications of the same thing. We will therefore treat them as one.
There is no yardstick by which mental anguish, worry, humiliation, etc., can be measured. It must be left to the discretion of the jury to determine in the light of all the facts presented. By allowing the full amount prayed, it is obvious that the jury felt that plaintiff had been greviously damaged in this respect. We will treat this as one item of damage in the sum of $15,000, and to that extent we will not disturb the jury's award, but will amend the judgment accordingly.
Items D, E and F are closely related but may be distinguished. Item F, loss of income, in the amount of $35,000 is reasonably supported by the testimony of Mr. Sehrt. His method of projecting the estimated loss is not effectively contradicted by defendants' expert witness on the subject and must be accepted.
*71 There is no doubt in our minds that in addition to the loss of income over the period covered by Sehrt's projection, plaintiff's business was damaged to the point that he had virtually to start over again. The damage to his reputation as a businessman, which involves his ability to obtain credit and secure new customers, is an additional element of damage which will make his recovery all the more difficult.
These items, D and E, like mental anguish are not susceptible of appraisal by any standard of measurement. That the plaintiff was seriously damaged in these respects cannot be denied. The jury's allowance for these items of damage is not so abusive of discretion under the facts of this case as to warrant a disturbance thereof. Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Booth v. Good Foods, Inc., 216 So.2d 885 (La.App.2d Cir. 1968); Guy v. Kroger Company, 204 So.2d 790 (La.App.2d Cir. 1967).
For the foregoing reasons the judgment in favor of Ted Kogos against Louis J. Rittiner and Joseph W. Nelkin jointly and in solido in the sum of $110,000 is amended by reducing same to $80,000, and as thus amended, and in all other respects, is affirmed at defendants-appellants' cost.
Amended and affirmed.

ON REHEARING
Before SAMUEL, HALL and BARNETTE, JJ.
BARNETTE, Judge.
We granted a rehearing limited to the issue of damages for "loss of income" which is referred to in plaintiff's pleadings as item F.
Counsel for defendants have strenuously objected to the court's reliance on the testimony of John Sehrt, certified public accountant. Among the many objections raised they have pointed out that Mr. Sehrt's estimate of loss of $36,913.99 for the period July, 1964 through May, 1965 (11 months) is an estimate of gross income lost, which it is argued, with obvious merit, is not the true measure of plaintiff's actual damage. The defendants do not concede that the plaintiff is entitled to any damage for the alleged loss of income for this period, but argue that in no event can he recover more than his net loss of income and that he has failed to offer any evidence to indicate what that loss was. We must concede that this argument has substantial merit and that we were in error in not giving proper consideration to it in our original opinion.
Mr. Sehrt used known figures for the years 1962 and 1963 and for the first five months of 1964 from which he projected an estimate of gross sales for the 11 months in question and arrived at the figure $340,961.48. The actual gross sales for the period were $207,697.99, making the loss in anticipated gross sales $133,263.49. From this figure he deducted $96,349.50, being the estimated cost of the merchandise which was computed at 72.3 percent of the anticipated gross sales. This figure, 72.3 percent, was computed from Kogos' tax returns for 1963 and the first five months of 1964. The cost of merchandise reflected by these returns was 72.5 percent in 1963 and 72 percent for January-May, 1964; the average being approximately 72.3 percent. By this method Sehrt arrived at $36,913.99 representing "Loss of Gross Profits." Obviously there are many cost factors which should be considered and deducted from the "gross" profit estimate to determine the anticipated net profit.
We have examined the record again in an attempt to find some evidence from which a reasonable estimate of the anticipated costs for rent, salaries, ultilities, advertising, insurance, delivery expense, and other operating costs might be computed in an attempt to determine the estimated net *72 loss. The only evidence is such as can be assumed from the cost of merchandising figures reported in Kogos' 1962 and 1963 income tax returns.
For 1962 Kogos reported gross sales from which was deducted cost of merchandise, resulting in a "gross profit" of $23,850.73. From this he deducted "miscellaneous" and "other business expenses," totaling $21,611.55, leaving a net profit of $2,239.18. For 1963 he reported gross profit (gross sales less cost of merchandise) of $62,984.12 from which expenses of $44,620.93 were deducted, leaving a net profit of $18,363.19.
Assuming that the gross sales for the 11-month period should have been $340,961.48 as anticipated by Mr. Sehrt's method of projection, we then compute the cost of the merchandise at 72.3 percent and arrive at the figure $246,515.15. The difference between the gross sales figure and the merchandise cost figure, which is $94,446.33, represents the anticipated gross profits.
The figures reported by Kogos in 1962 and 1963 for tax purposes indicate the net profit in 1962 was 9.4 percent of the gross profit and in 1963, 29.2 percent; an average percentage of net profit for the years 1962 and 1963 of 16.3 percent. But we are unwilling to apply this figure or any other in an attempt to compute the percentage of net profit which might have been anticipated on the basis of $94,446.33 anticipated gross sales for the obvious reason that many factors must be considered which would require the assistance of experts in the field of accounting.
Even the most expert accounting procedures would result in a figure largely speculative. Any attempt on our part to arrive at a conclusion without expert testimony would be sheer folly, and any conclusion we might reach would be so grossly speculative that it could not form the basis of a judgment. Davis v. Royal-Globe Insurance Companies, 223 So.2d 912 (La. App. 4th Cir. 1969); McDonald v. Scotlandville Fire Protection District Commission, 222 So.2d 324 (La.App. 1st Cir. 1969). We therefore conclude that the plaintiff has failed to substantiate his claim for damages for loss of income.
In our original opinion we took cognizance of the close relationship between items D, E, and F, damages to "business," "reputation," and "loss of income"; but said they could be distinguished. Counsel for defendants have argued that "damage to business" cannot be distinguished from "loss of income." Whether or not there is a basis for distinction, in view of our opinion on this rehearing that there can be no allowance of damages for loss of income, it is not necessary to discuss this issue any further.
As stated in our original opinion, the plaintiff did sustain substantial damage to his business and to his reputation as a businessman. The allowance of damages for these two items as found by the jury, and affirmed by us on the authority of the cases cited, is not embraced within the limited rehearing granted and will not be discussed further.
For these reasons our original decree is recalled and set aside and it is now ordered, adjudged and decreed that the judgment appealed from in favor of Ted Kogos against Louis J. Rittiner and Joseph W. Nelkin, jointly and in solido, in the sum of $110,000 is amended by reducing same to $45,000, and as thus amended, and in all other respects, is affirmed at defendants-appellants' cost.
Amended and affirmed.