339 So.2d 904 (1976)
FIDELITY & GUARANTY INSURANCE COMPANY, Plaintiff-Appellee,
v.
CENTRAL PLUMBING & HEATING COMPANY et al., Defendants-Appellants.
No. 5683.
Court of Appeal of Louisiana, Third Circuit.
November 10, 1976.
*905 Gist, Methvin & Trimble by James T. Trimble, Jr., Alexandria, for defendants-appellants, Central Plumbing.
Neblett, Fuhrer & Broussard by Leonard Fuhrer, Alexandria, for plaintiff-appellee, People's Furniture.
Gravel, Roy & Burnes by Christopher J. Roy, Alexandria, for plaintiff-appellee, Gus Kaplan, Inc.
Gold, Hall, Hammill & Little by James D. Davis, Alexandria, for defendants-appellants.
McLure & McLure by John G. McLure, Alexandria, for defendant-appellee.
Stafford, Randow, O'Neal & Scott by John W. Scott, Alexandria, for plaintiff-appellee.
Before HOOD, CULPEPPER and WATSON, JJ.
WATSON, Judge.
This is one of four lawsuits involving damages occurring during a wind and rain storm in Alexandria, Louisiana, on or about December 2, 1973. All were consolidated for a lengthy jury trial and this appeal. A metal cowl or vent cover on the roof of the Piccadilly Cafeteria was blown loose and rolled over the roof of the Alexandria Mall, puncturing the roof in at least two places. Water damage resulted to the merchandise owned by Gus Kaplan, Inc. and Peoples Shoe Stores, Alexandria Mall, Inc., two other tenants of the mall. Plaintiff, Fidelity & Guaranty Insurance Company, brought this suit, docket # 5683, to recover its subrogation claim of $20,517.30, which it paid its insured, Gus Kaplan, Inc.
In docket no. 5684, Massachusetts Bay Insurance Company v. Central Plumbing & Heating Company, et al, the insurer of Peoples Shoes, Alexandria Mall, Inc., sued to recover its subrogation claim of $13,291.43.
*906 In docket no. 5685, Peoples Shoes sued to recover damages, over and above the amount paid by its insurer, for:
". . . loss of merchandise, loss of profit on ruined merchandise, loss of profit on related merchandise, loss of services of employees, disruption of business operations, cost of repairs, loss of good will and commercial reputation, damage to credit reputation and loss of interest on borrowed money, . . ."[1]
In docket no. 5686, Gus Kaplan, Inc. sued to recover damages, over and above the amount paid by its insurer, for:
". . . loss of merchandise, loss of profit on ruined merchandise, loss of profit on related merchandise, loss of services of employees, disruption of business operations, cost of repairs, loss of good will and reputation."[2]
Separate opinions have been rendered this date in the other three cases, but all issues will be discussed in this case which bears the initial docket number, and which contains the transcript of trial testimony.
Defendants herein are Central Plumbing & Heating Company, a commercial partnership between Leroy and Jimmie B. Guinn, which installed the vent cover; Central's liability insurer, Hartford Fire Insurance Company; the partners individually; Piccadilly Cafeteria, Inc.; a division of Piccadilly known as National Construction Company; Louisiana Investors of Delaware, Inc., owner of the mall; Aetna Casualty & Surety Company, the liability insurer of both Piccadilly and Louisiana Investors; Tudor Construction Company, general contractor for construction of the mall; and Tudor's insurer, American Employers Insurance Company.
Central, the Guinns and Hartford will sometimes be referred to collectively as "Central".
The parties filed third party demands and other pleadings, many of which are not pertinent to these appeals.
In the instant suit, judgment was rendered in favor of plaintiff Fidelity against: Central; the Guinns, individually; Hartford; Piccadilly, doing business as National Construction Company; Aetna; and Louisiana Investors, in solido, for $20,517.30. Louisiana Investors was given judgment over against Central. Central was given judgment over against Piccadilly, d/b/a National Construction, and Aetna, in solido, for one-half of the indemnity to Louisiana Investors. Costs were taxed one-half against Central and one-half against Piccadilly and Aetna.
The jury assessed the damages due Peoples Shoes, Alexandria Mall, at $36,896.37. The jury also awarded $13,291.43, the amount stipulated, to Peoples' insurer, Massachusetts Bay Insurance Company. Kaplan's damages were assessed at $55,777.30. The jury also awarded $20,517.30, the amount stipulated, to Kaplan's insurer, Fidelity.
The trial court denied remittitur or a new trial, finding the jury had sufficient evidence on which to award the damages assessed.
Central has appealed in all four suits, contending that:
(1) the jury erred in finding negligence by Central;
(2) the trial judge erred in failing to instruct the jury as to the proof necessary to recover loss of profits, and in failing to instruct that the award should be limited to net rather than gross profits; and
(3) the awards are manifestly excessive. Louisiana Investors, Piccadilly and Aetna have also appealed, adopting specifications of error two and three above and alleging, in addition, that the trial court erred in failing to:
(1) properly apportion liability;
(2) require production of business records substantiating the claims of loss of business; and *907 (3) reduce the awards.
Peoples has answered the appeal in docket number 5685, asking that its award be increased from $36,896.37 to $100,000 to include loss of associated profits, loss of employees' services, disruption of business operations, loss of goodwill and commercial reputation, damage to credit reputation and loss of interest on borrowed money.
The jury concluded that Central and National Construction Company were negligent.[3] Piccadilly, Louisiana Investors and Tudor were found free of negligence by the jury, but Piccadilly and Louisiana Investors were held responsible under the principle of strict liability. The jury decided that Louisiana Investors was entitled to full reimbursement or indemnity from Central for its share.
Certain matters were not submitted to the jury but tried only to the trial judge. In his reasons for judgment, the trial court related the facts, some of which are as follows:
". . . Tudor Construction Company. . . constructed for Louisiana Investors the connecting hallways and the shells of the spaces to be leased out which included the roof of the entire complex. Each tenant, including Peoples, Gus Kaplans and Piccadilly, constructed its own interior including its own air conditioning and heating systems. Roof penetrations were made by the tenants or their contractors.
"Piccadilly Cafeteria, Inc. did its own construction work but, for that purpose, assumed a trade name which it referred to as a division of Piccadilly Cafeteria, Inc. This division was known as National Construction Company. National Construction contracted with Central Heating and Plumbing Company for certain work on the cafeteria location in the Mall. This work included installation of a cowl or metal covering over an air-intake vent located on the roof above the cafeteria. This work was done several months prior to December 1973.
"On or about December 2, 1973, a rain storm accompanied by wind occurred in Alexandria. The vent covered [sic] in question blew off and damaged the roof including penetrations in more than one place. Water entered the penetrations and emptied into the store room of Peoples and the show room of Gus Kaplans, Inc. Considerable merchandise in both stores was ruined. The insurers of each concern paid the cost of the merchandise lost and they became subrogated for the damage claims against those responsible." (Tr. 133)
The trial court decided that National Construction Company is not a separate entity but another name for Piccadilly Cafeteria, Inc., making the liability of Piccadilly and National that of one party, not two. The trial court concluded that Central, Piccadilly and Louisiana Investors were liable in solido. A third party demand of Louisiana Investors against Central was found to state a cause of action. Piccadilly contended that Central must indemnify Louisiana Investors for its one-third share of the damages, leaving Piccadilly responsible for one-third and Central for two-thirds. Central contended that the liability was one-half to Piccadilly and one-half to Central with the one-third owed by Louisiana Investors being split equally between them. The trial court adopted the latter argument and concluded that there should be an equal apportionment of the damages between Piccadilly and Central.
Thus, on the basis of the facts, the judgments and the specifications of error, there are three issues which must be decided on appeal. These are:
(1) whether the jury's conclusion that Central was negligent is manifestly erroneous;
(2) whether the trial court correctly instructed the jury as to the proof necessary *908 for Peoples and Kaplan's to recover loss of profits and whether the amounts awarded are excessive or inadequate; and
(3) whether the trial court properly required Piccadilly to share equally with Central in indemnifying Louisiana Investors.
I. The first issue is whether the jury's conclusion that Central was negligent is manifestly erroneous.
Central contends that the cowl, which measured approximately six feet by four feet, with a depth of 14 inches, was removed and not re-anchored by other parties, who were finishing the roof, between the initial installation and the date of the accident. While there is testimony from Central's employees that supports this contention, it is far from convincing.
There is no question that installation of the cowl or vent cover was Central's responsibility. National Construction Company sub-contracted all of Piccadilly's plumbing, air conditioning and heating, as well as the accessory duct work and vents, to Central. Central had a legal duty under the contract with National Construction to properly install the vent cover or cowl. Lon S. Heuer, an architect and expert in shopping center design, testified that failure to attach an air intake cover such as this would not be an acceptable practice in the building industry.
Homer Roberts, general foreman of Central's sheet metal department, said that the cowl was put on "temporarily" on instructions from the job superintendent for National Construction, William Reese. Reese was no longer employed by National Construction at the time of trial and could not be located to testify. Although Roberts' testimony on this point was uncontradicted, he admitted that no effort was made to follow-up what he termed the temporary attachment with a permanent one. He further admitted, under cross-examination, that nothing was said by Reese which relieved Central of the responsibility for permanent attachment of the cowl.
All of Central's witnesses insisted that they initially nailed the cowl in place. Roberts, who admitted Central put in on "temporarily", said:
". . . I did see that it was nailed on the first time." (TR. 705)
Yet, the testimony as a whole indicates that the cowl was never nailed down until after the windstorm in December. Phillip L. Carney, project manager for Tudor, inspected the wooden curb around the vent opening after the accident and found no holes that would indicate the cowl had been nailed or screwed to the curb. Examination of the curb by a group prior to trial revealed that the only nail holes in the curb were six which were made after the windstorm. The group included: Geoffery Donald Baillie Mcintosh, general manager of National Construction; Edward M. Kelly, maintenance engineer for Piccadilly; Pierre J. Gentile, general superintendent for National Construction; and Willie Louis Beauchamp, an Alexandria employee of Piccadilly. Weldon S. Honeycutt, superintendent for Tudor, said he observed some nail holes after the incident, but these could have been in the flange of the cowl. Carney found no holes in the curb after the windstorm but said some had been punched in the flange. Because of the roofing felt between the curb and the flange it would have been impossible for Central's employees to renail using the same nail holes if the roofing felt was put on after they first nailed down the cowl. One of them, J. C. Ward, who supervised the installation, admitted as much. Central's employees said that the roof in the area was not finished when they first installed the cowl. There was ample other testimony from which the jury could conclude that the roof over the Piccadilly had been completed prior to the vent cover being put in place. Pierre J. Gentile, general superintendent for National Construction, testified that the roof above the Piccadilly had been completed before this vent opening was cut. Charles A. Viccinnelli, sub-contractor for the Mall roof, said the roof was finished and graveled before any penetrations were made in it. Willie Sloane, general foreman for Viccinnelli Roofing, testified that the vent cover *909 was put on after the roofing work was completed. Simy Tate, also a Viccinnelli roofer, testified that roofers never move any of the cowls or other sheet metal appliances because this is solely within the province of sheet metal workers.
Not only does the evidence indicate that Central initially failed to secure the cowl, but its employees were unaware of the manufacturer's instructions for installation printed on the underside, which prescribed lag screws or bolts every 14 inches. Viccinnelli testified that lag screws or bolts, rather than nails, should have been used, because nails would loosen. Marion Chaney, a mechanical engineer, said ten screws or bolts should have been used to secure the vent cover.
The evidence shows no manifest error in the jury's conclusion that Central was negligent and that the negligence was a legal cause of the damage to plaintiffs.
II. The second issue presented is whether the evidence justifies the amounts awarded and whether the trial court correctly instructed the jury as to the proof necessary for Peoples and Kaplan's to recover loss of profits.
We will review briefly the evidence presented by plaintiffs on the issue of damages. Three witnesses, the assistant manager, an employee, and the owner, testified in behalf of Peoples.
Gary Ellis Maxwell, who was assistant manager of Peoples Shoe Store, Alexandria Mall, testified that when he came to work on Monday, December 3, 1973, the section of the store room containing women's spring and holiday dress shoes was completely ruined as the result of water and debris from the ceiling and roof. Almost the entire stock of women's dress shoes was affected, as well as some of the casual shoes. Maxwell turned away many dissatisfied ladies because of the lack of stock, which could not be replaced for the Christmas season. Referral to the downtown Peoples store was unsuccessful. The store also lost sales of accessory items such as matching handbags and hosiery. In Maxwell's experience, at least sixty or seventy per cent of the ladies who buy shoes will also buy accessories to go with them, but the accessories do not sell alone.
Jerry Lynn Harp, an employee of Peoples Shoe Store for 27 years and manager of the mall store at the time of the accident, reiterated Maxwell's testimony. Harp further said that the merchandise destroyed was all new, since the mall had just opened. Advertising during the Christmas period is primarily for ladies' dress shoes, the store's bestselling item. Business from the opening of the mall on August 1 until this incident had been "fantastic". There were nine or ten other shoe stores in the mall where ladies' shoes could be purchased. Christmas was normally a good season for sale of accessories, but coordinated handbag sales were completely wiped out as the result of the damage to the shoes. Handbag prices are approximately the same as shoe prices; handbag purchases comprise about 50% of shoe sales. Peoples is a family shoe store but the majority of the purchases were made by ladies. Sales of children's shoes decreased because ladies did not come in to buy shoes for themselves and hence failed to purchase children's shoes. Harp said many of the customers asked for him personally, and he lost goodwill because of his inability to service them.
Alvin Mykoff said that he had been in the shoe business with his father since 1951 when he graduated from college. They opened Peoples Shoes, Alexandria Mall, August 1, 1973. His father retained a 25% interest in the downtown store but the mall store was owned solely by the younger Mykoff. Mykoff confirmed the testimony of Maxwell and Harp. Mykoff also said that none of the mall merchandise had been moved from the downtown store. Shoes had to be ordered between six and nine months in advance of delivery for a complete inventory. Payment is made within 30 days of delivery with 80% of Mykoff's suppliers; a few concerns allow 60 days. In 1973, matching handbags and shoes were in vogue. This first Christmas season at the mall was heavily advertised. The normal mark-up for shoes and accessories is 50%.
*910 All of the costs, including utility bills, insurance premiums, advertising bills, salaries of employees, and interest on borrowed money, remained constant after this water damage. Overhead did not go down. Profit is generally higher during peak seasons such as Easter, back-to-school and Christmas. Cash flow during Christmas usually reduces Mykoff's borrowing against Peoples' $50,000 bank line of credit. Interest of 9½ to 10% was being paid. After the accident, the credit line remained borrowed to the limit because cash was not coming in for reduction of the debt. This damaged Mykoff's credit and hindered subsequent business operations. The wholesale value of the shoes destroyed was $18,753.46 which was recovered from Peoples' insurer. The retail value was $37,506.92. Mykoff said that all dollars beyond overhead would be profit.
As to the damages sustained by Kaplan's, four witnesses, including the assistant manager, the manager, a CPA, and the majority stockholder, testified.
Robert Carroll testified that he was working at Kaplan's in December of 1973 as an assistant to Gus Kaplan. On December 3, there was water damage in misses' sportswear, junior sportswear, the receiving room, the lay-away room, the upstairs stock room and the lingerie department. Until the mess caused by the water, business had been terrific at the mall store.
Sidney Kaplan testified that he graduated from the University of Alabama and then worked at Foley's Department Store in Houston to further his merchandising education. He later undertook management of Gus Kaplan's in MacArthur Village, and, a year later, became manager of the mall store. The merchandise damaged was primarily merchandise for the Christmas season. It turns over rapidly, particularly the better sportswear. Misses' outfits are composed of coordinate groups. If one coordinate is missing, sales of the matching items are also lost. Most sales are multiples; sixty per cent of the customers buy more than one item. The mark-up of the goods is 50%. A sidewalk sale was held for the damaged merchandise in February.
Sales of that sort are not good, since the amount realized is minimal and you do not get customers into the store.
Roy K. Derbonne, Jr., a CPA, testified that his firm audits the records of Gus Kaplan, Inc. and he is chief auditor for the account. Kaplan's 1974 fiscal year included the damage in December of 1973. From 1971 through 1975, Kaplan's only year with a loss was 1974. The pre-Christmas season accounts for a fourth of Kaplan's total volume of business. The $53,500 wholesale value of the goods damaged would have resulted in a gross of $80,816 if the average for the four profitable years was used and a gross of $78,331 if the five year average was used.
Gus Kaplan, majority stockholder in Gus Kaplan, Inc., testified that he is a business graduate of LSU with extensive merchandising experience. Kaplan found the damage to his newly opened store very disheartening. The year was a big one for sportswear and pants with few sales of dresses. The merchandise damaged was fast-moving stock, which had been ordered six to eight months before. There was a delay in the damaged merchandise being picked up, but goods with a wholesale value of $25,014.49 were eventually picked up by Tudor and Kaplan was paid for this merchandise in June, 1974. Kaplan felt the sidewalk sale reflected on his store. Fifty to sixty per cent of the retail sales of this merchandise would have resulted in accessory or related sales. Kaplan's only year of loss in his business history was the fiscal year of the damage when he lost $174,000.
Appellants contend that Peoples and Kaplan are only entitled to recover the wholesale cost of the damaged goods, or, at most, the wholesale cost plus a 10% profit. This argument overlooks the fact that all of the overhead of the two stores continued after the accident. Since the overhead of the two stores continued without alteration, any profit realized on the damaged merchandise would have been net profit. A merchant which sold all its goods at wholesale value and recovered only 10% in addition *911 for both overhead and profit would obviously not continue long in business. The intangibles involved, such as loss of profit on associated sales, loss of customers because of lack of inventory, and disruption of the normal business routine with its adverse effect on customers, illustrate that these are damages which are particularly within the province of the trier of fact's much discretion. LSA-C.C. art. 1934. The jury apparently believed the testimony that the merchandise lost by both stores was that which would have normally sold fast and well during the peak Christmas shopping season, when merchants do a large proportion of their total business.
Kogos v. Rittiner, 228 So.2d 62 (La. App. 4 Cir. 1969); writ refused 255 La. 245, 230 So.2d 93, is cited for the proposition that only net profits can be recovered. Kogos involved a situation where there was:
". . . the ultimate virtual destruction of plaintiff's business . . . ."
228 So.2d 64
That situation, where a business was virtually destroyed and the lost income was projected without evidence as to what the overhead would have been, is entirely different from this. Here, all overhead continued in full. Any profit which would have been realized by Kaplan's and Peoples on the damaged merchandise would have been net profit. Kogos is also authority for the fact that damage to business and damage to reputation which are:
". . . not susceptible of appraisal by any standard of measurement." 228 So.2d 71
must be left to the discretion of the trier of fact.
This jury was correctly charged by the trial court that plaintiffs had the burden of proving by a preponderance of the evidence the damages caused by defendants' fault; that such proof may be either direct or circumstantial and constitutes a preponderance when, on the whole, it shows the facts sought to be proved more probably true than not.
Kaplan's overhead was unchanged because of this loss. If the jury accepted the average for four years, excluding the year of the loss, the damaged merchandise would have grossed $80,816. Kaplan's insurer paid $25,014.49 and $6,684.50 was obtained from the sidewalk sale for a total of $31,698.99. The loss in profits could have been evaluated at $49,117.01, which would have been a net rather than a gross because the overhead was constant. The jury's award of $55,777.30 thus may include only $6,660.29 for additional factors. These could include the time of year when profits are higher; loss of sales of matching items; disruption of business; inconvenience to customers; loss of benefit from advertising purchased; or other intangibles.
The award of $36,896.37 to Peoples could have included lost profits of $18,753.46 on the damaged goods and the balance of $18,142.91 could represent interest on borrowed money; damage to credit; loss of associated sales; damage to the store's reputation; loss of goodwill; loss of benefit from advertising purchased and other intangibles.
The trial court pointed out in denying new trial or a remittitur that:
"The jury in this case was composed of an unusually intelligent and competent group of citizens." (TR. 165)
The trial court went on to state that the equities involved were by no means simple, and concluded that the jury had ample facts on which to base the awards of damages. The fact that the trial judge has left a jury award undisturbed must be recognized and given weight. Cf. Jenkins v. Dixie Rental Tools & Casing Crews, Inc., 283 So.2d 271 (La.App. 1 Cir. 1973); writ den. 285 So.2d 542; Miller v. Chicago Insurance Company, 306 So.2d 355 (La.App. 3 Cir. 1975); affirmed 320 So.2d 134 (La., 1975).
The intangibles claimed by Kaplan's and Peoples are particularly within the province of the "much discretion" accorded the trier of fact by the Louisiana Civil Code. The amounts awarded are not manifestly excessive.
*912 Likewise, the award to Peoples is not manifestly inadequate, as contended in Peoples' answer to the appeal.
There is no abuse of the jury's much discretion in the amounts of these awards.
III. The third issue presented is whether the trial court erred in deciding that Piccadilly must share with Central in the one-third indemnity to Louisiana Investors.
Piccadilly contends that Central must indemnify Louisiana Investors for its one-third share of the damages leaving Piccadilly responsible for one-third and Central for two-thirds. However, both Piccadilly, through its division, National Construction Company, and Central were found to be negligent by the jury. Louisiana Investors was found to be technically responsible under the principle of strict liability but free from negligence. The two tort-feasors whose negligence caused the injury to plaintiffs are liable in solido for the damages. Since Louisiana Investors is only constructively at fault, Louisiana Investors is entitled to indemnity from the two tort-feasors, Central and Piccadilly-National Construction Company. The trial court correctly decided that Piccadilly and Central must share the indemnity to Louisiana Investors. LSA-C.C. art. 2103; Loescher v. Parr, 324 So.2d 441 (La., 1976); Green v. Taca International Airlines, 304 So.2d 357 (La., 1974).
For the foregoing reasons, the judgment of the trial court herein is affirmed. All costs of this appeal are assessed against defendants-appellants.
AFFIRMED.
NOTES
[1] Tr. 15, Docket # 5685.
[2] Tr. 8, Docket # 5686.
[3] Due to the complexity of the issues and the multiplicity of parties, the trial court submitted special forms to the jury, pursuant to LSA-C. C.P. arts. 1811 and 1812, to facilitate the jury's making findings as to the liability, if any, of the various defendants and as to the damages of the various plaintiffs.