# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 24-251


**COMMERCIAL RESTORATION COMPANY, LLC**

**VERSUS**

**NANAKI, LLC**

*******************

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. 2021-71
HONORABLE JUDI F. ABRUSLEY, DISTRICT JUDGE

*******************

## CHARLES G. FITZGERALD
## JUDGE

*******************


Court composed of Shannon J. Gremillion, Van H. Kyzar, and Charles G. Fitzgerald, Judges.


**REVERSED IN PART;**
**AFFIRMED AS AMENDED.**

**John W. Joyce**
**Stephen R. Klaffky**
**Barrasso Usdin Kupperman Freeman & Sarver, LLC**
**909 Poydras Street, Suite 2350**
**New Orleans, Louisiana 70112**
**(504) 589-9700**
**Counsel for Third Party Defendant/Appellant:**
	**AmGUARD Insurance Company**

**Wells T. Watson**
**Baggett McCall, LLC**
**Post Office Box 7820**
**Lake Charles, Louisiana 70606-7820**
**(337) 478-8888**
**Counsel for Third Party Plaintiff/Appellee:**
	**Nanaki, LLC**

**Michael Reese Davis**
**Hymel, Davis & Petersen, LLC**
**10602 Coursey Boulevard**
**Baton Rouge, Louisiana 70816**
**(225) 298-8118**
**Counsel for Third Party Plaintiff/Appellee:**
	**Nanaki, LLC**

**Kevin Sloan**
**Gauthier Murphy & Houghtaling, LLC**
**3500 North Hullen Street**
**Metairie, Louisiana 70002**
**(504) 456-8600**
**Counsel for Third Party Plaintiff/Appellee:**
	**Nanaki, LLC**

**FITZGERALD, Judge.**

This is a Hurricane Laura case. AmGuard Insurance Company appeals a final judgment awarding its insured Nanaki LLC policy limits, bad-faith penalties and fees, and consequential damages.

## ISSUES

On appeal, AmGuard presents the following issues:

> 1. Whether Nanaki, which owed a duty to mitigate, can recover damages for estimated costs of mitigation it never performed.
>
> 2. Whether Nanaki can recover full replacement cost value for property not repaired or replaced where the policy states: "We will not pay on a replacement cost basis for any loss or damage . . . [u]ntil the lost or damaged property is actually repaired or replaced[,]" and can recover the replacement cost of all furniture, fixtures, and equipment based on unsupported testimony that "more than half" was damaged.
>
> 3. Whether Nanaki can recover more business income than it would have earned but for the property damage under a policy that covers only "actual loss of Business Income" and defines business income as the net income "that would have been earned or incurred if no physical loss or damage had occurred[.]"
>
> 4. Whether AmGUARD had satisfactory proof of loss and acted in bad faith when it had conflicting reports of the scope of damage, proposed a solution Nanaki's adjuster considered reasonable, repeatedly requested material information that Nanaki withheld, and received false and misleading information instead.
>
> 5. Whether the district court manifestly erred in finding AmGUARD caused lost profits when Nanaki spent only 3% of the $2.5 million paid by AmGUARD to restore the property and in awarding an amount not proven with reasonable certainty, and erred as a matter of law in failing to deduct the avoided expenses of operating the hotel while it was closed.

## FACTS AND PROCEDURAL HISTORY

Nanaki is owned by Paul Singh and his wife. At all relevant times, Nanaki owned the Days Inn & Suites hotel in Kinder, Louisiana. The Days Inn consists of two buildings with 129 guest rooms. On August 27, 2020, the hotel was badly damaged by Hurricane Laura.

AmGuard issued an all-risk, replacement-cost policy to Nanaki which covered the damages to the Days Inn caused by Hurricane Laura. The policy limit for Building 1 was $3,247,296.48, and the policy limit for Building 2 was $1,916,541.24. The insurance policy contained Business Personal Property (BPP) and contents limits of $250,000.00 for each building. It also had a $50,000.00 limit for Other Structures. Finally, it covered Business Interruption with no limit for a period of one year plus thirty days.

The day after the hurricane, Nanaki filed its claim with AmGuard. Nanaki then attempted to mitigate damages by hiring Commercial Restoration Company LLC (CRC). On September 30, 2020, Nanaki entered a Restoration & Rebuild Agreement with CRC to restore the hotel to its pre-hurricane condition. But two days later, Nanaki—concerned about the cost of the potential repairs—requested that CRC stop work. CRC's bill for a few days' work was $166,477.97. CRC ultimately filed suit against Nanaki for payment of this sum.[1]

Within a week of terminating CRC, Nanaki hired public adjuster Pinnacle Limited. Pinnacle recommended a second mitigation company, Rainbow International. And in mid-September 2020, Nanaki entered a mitigation contract with Rainbow designated a Not to Exceed Agreement. Rainbow agreed to remove sheetrock, insulation, and drywall from "all areas of building" and complete "dehumidification and air movement to bring interior to dry standard: for a sum not to exceed $594,000.00."

However, Rainbow stopped working in November 2020. Paul Singh explained that Rainbow initially underestimated the magnitude of the damages. A

---

[1] In response, Nanaki filed a third party demand against AmGuard. The judgment from this incidental action is now before us on appeal.

few months into the job, Rainbow requested a change in work scope. It then issued a 230-page mitigation estimate of $1,139,376.76.

Turning now to AmGuard's adjustment of Nanaki's claim. On September 5, 2020, Engle Martin & Associates inspected the damage to the Days Inn. Engle Martin was an independent adjusting firm hired by AmGuard. Four days after inspecting the property, Engle Martin submitted a preliminary report to AmGuard with a final estimate of damages expected within two weeks. The initial report estimated building damages of $1,000,000.00 and business interruption of $400,000.00. The report then stated: "**Due to the severity and size of the loss, we are requesting authority to engage a building consultant to thoroughly investigate the loss property and provide a detailed repair recommendation and estimate of repairs.**" (Emphasis in original). Finally, the report recommended that AmGuard advance $100,000.00 to Nanaki to assist with mitigation. This sum was paid to Nanaki as a building advance on September 16, 2020. AmGuard, however, fired Engle Martin before it completed its final estimate.

The adjustment of Nanaki's claim was then handled by AmGuard estimating supervisor Corey Massaro, who took over the claim from Engle Martin on September 11, 2020. Massaro inspected the property on September 24, 2020, October 14, 2020, and December 2, 2020. After his first inspection, Massaro obtained an estimate for roof replacement in the amount of $162,506.73. Two weeks later, AmGuard advanced this sum to Nanaki.

Meanwhile, on October 7, 2020, Nanaki adjuster Pinnacle provided Massaro with an estimate of $353,633.82 for BPP damages. One day later, Pinnacle supplemented the estimate by adding $81,628.07 for new mattresses. Seven days after that, AmGuard advanced $50,000.00 to Nanaki towards BPP coverage.

3

Around this time, Massaro hired Hillman Consulting LLC, an industrial hygiene firm, to measure and map areas of elevated moisture throughout the hotel. Hillman provided a report to AmGuard on October 13, 2020. The report noted elevated moisture and apparent microbial growth in many areas of the hotel and made recommendations for drying and removal.

Ten days later, on October 23, 2020, Pinnacle provided Massaro with an estimate of loss of $1,923,331.64 for Building 1 and $1,661,262.44 for Building 2 (or $3,584,594.08 for both buildings). The estimate consisted of 588 pages and entailed gutting both buildings. Although the estimate did not include the cost of demolition or removal, Pinnacle had estimated $1,025,000.00 for that work four days earlier.

On December 2, 2020, Massaro inspected the hotel for a final time. One week later, he emailed Pinnacle an estimate of damages styled "repair scope and summary." Massaro concluded that the net sum due Nanaki—not including prior payments—totaled $1,792,831.91. Thus, as of December 9, 2020, AmGuard acknowledged that Nanaki was owed at least that amount in unpaid coverage. Eight days later, AmGuard issued a building advance to Nanaki of $500,000.00.

In early February 2020, Nanaki and Pinnacle parted ways. According to Singh, Nanaki lacked the funds to continue paying Pinnacle.

Nonetheless, on February 23, 2021, Massaro provided Pinnacle with a formal proof of loss. Here, Massaro estimated that the net sum due Nanaki was $1,764,243.97, not including the $812,506.73 previously advanced. There was even a note in AmGuard's claim file dated February 24, 2021, stating that the "undisputed" sum due Nanaki was $1,764,243.00.

By mid-February 2021, Nanaki had retained counsel. Nanaki's counsel, in turn, responded to Massaro's email of February 23, 2021, by sending a proof of loss

of $7,779,237.01. Upon receiving this estimate, AmGuard transferred the claim to its legal department, retained outside counsel, and Massaro had no further involvement. But during the months that followed, AmGuard continued to withhold from Nanaki the undisputed portion of the claim: $1,764,243.96. Ultimately, the sum of $1,554,876.84 was paid to Nanaki on June 3, 2021. And the remaining sum of $209,367.12 was paid on September 15, 2021.[2]

Many months earlier, however, Nanaki had filed suit against AmGuard for breach of contract, statutory penalties and fees, and consequential damages. A three-day bench trial was held in July 2023. Oral reasons for judgment were given in November 2023, and a written final judgment was signed by the trial court on December 5, 2023. In relevant part, the judgment provides:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is rendered in favor of Third-Party Plaintiff, Nanaki, LLC and against Third-Party Defendant, AmGuard Insurance Company, as follows:

| | |
|---|---|
| Additional Structural Damages: | $ 2,846,454.15 |
| Penalties for bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay structural damages: | $ 1,686,356.18 |
| Attorney's Fees for bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay structural damages and on related penalties: | $ 1,686,356.18 |

---

[2] To summarize, AmGuard estimated damages in the amount of $2,576,750.69 and paid these funds to Nanaki as follows:

| Date | Amount | Coverage |
|---|---|---|
| 9/16/2020 | $ 100,000.00 | Building advance |
| 10/15/2020 | $ 50,000.00 | Business personal property |
| 10/16/2020 | $ 162,506.73 | Building advance |
| 12/17/2020 | $ 500,000.00 | Building advance |
| 6/3/2021 | $ 525,174.09 | Building supplement |
| 6/3/2021 | $ 1,029,702.75 | Building supplement |
| 9/15/2021 | $ 50,000.00 | Appurtenant structure |
| 9/15/2021 | $ 54,683.56 | Business personal property |
| 9/15/2021 | $ 104,683.56 | Business personal property |
| Total | $ 2,576,750.69 | |

5

| | |
|---|---|
| Penalties for bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay Mitigation damages: | $ 569,688.38 |
| Attorney's Fees for bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay Mitigation damages and on related penalties: | $ 569,688.38 |
| Additional Business Personal Property (BPP) damages: | $ 225,894.77 |
| Penalties for bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay BPP damages: | $ 192,630.95 |
| Attorney's Fees for bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay BPP damages and on related penalties: | $ 192,630.95 |
| Lost Business Income (BI) damages: | $ 256,799.00 |
| Penalties for bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay BI damages: | $ 128,399.50 |
| Attorney's Fees for bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay BI damages and on related penalties: | $ 128,399.50 |
| Penalties for bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay "Other Structures" damages: | $ 25,000.00 |
| Attorney's Fees for bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay "Other Structures": damages and on related penalties: | $ 25,000.00 |
| Consequential Damages under La. R.S. 22:1973: | $ 1,116,546.00 |
| TOTAL: | $ 9,649,843.94 |

AmGuard now appeals this judgment, asserting five assignments of error:

1. The district court erred in awarding Nanaki damages for the cost of mitigation it never performed.

2. The district court erred in awarding Nanaki full replacement cost value for damaged property and contents Nanaki has not repaired or replaced.

3. The district court erred in awarding business income loss that was not based on the actual loss sustained during the coverage period.

4. The district court erred in finding AmGUARD received satisfactory proof of loss and acted in bad faith when the extent of damage was unknown, AmGUARD made reasonable efforts to obtain information and adjust the claim, and Nanaki withheld information and submitted false and misleading information.

5. The district court erred in awarding Nanaki $1,116,546 in consequential damages absent causation and despite clear evidence that the amount was inflated and failed to deduct avoided expenses as required by law.

## LAW AND ANALYSIS

Questions of law are reviewed de novo. *Domingue v. Bodin*, 08-62 (La.App. 3 Cir. 11/5/08), 996 So.2d 654. Under this review standard, an appellate court simply determines whether the trial court was legally correct.

Findings of fact, on the other hand, are reviewed under the manifest error standard. "It is well-settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong." *Rabalais v. Nash*, 06-999 (La. 3/9/07), 952 So.2d 653, 657. This review standard also applies to mixed questions of law and fact. *Lakefront Mgmt. Auth. v. J & J Partners, L.L.C.*, 21-102 (La.App. 4 Cir. 11/10/21), 331 So.3d 434, *writ denied*, 21-1855 (La. 2/15/22), 332 So.3d 1188.

Before going further, a short summary of the evidence adduced at trial will be useful.

### Summary of the Record Evidence

At trial, Nanaki called the only engineering expert to testify. Nanaki called the only contracting expert who estimated damages. Nanaki introduced the only mitigation estimate. And Nanaki introduced the only BPP estimate.

*Rebuild Damages*

Engineer Charles Norman was the only expert to testify about the forces of Hurricane Laura on the Days Inn. Norman explained how the hurricane's

7

combination of wind, rain, and drop in barometric pressure bludgeoned the hotel. He noted that the Days Inn was on the east side of the eye, placing it on the "dirty" or worst side. He further noted that the wind-driven rain entering the hotel was classified as Category 3 water, which is the most contaminated water cited by the American National Standards Institute. According to Norman, this necessitated the removal of all materials in the hotel except the studs and concrete.

AmGuard, on the other hand, argued that the damage to the Days Inn was not caused by a hurricane. Indeed, AmGuard's expert climatologist said so at trial. But this opinion was contradicted by AmGuard's other evidence. For example, AmGuard adjuster Massaro testified that "it was clear there was a hurricane." AmGuard adjuster Engle Martin likewise found that the damage to the Days Inn was due to wind and rain caused by Hurricane Laura. In addition, AmGuard's internal Large Loss Notice of September 11, 2020, acknowledged that there was wind damage to the Days Inn exterior from Hurricane Laura with heavy interior water intrusion to the second-floor rooms and secondary water intrusion to the first floors. In the end, the trial court found that the hotel's damage was caused by Hurricane Laura.

Engineer Norman also testified about the structural damage to the Days Inn. Norman explained that the rafters (trusses) were pulled apart by the hurricane. In his opinion, all trusses needed to be replaced, along with the sheathing. The trusses, he explained, were broken and uneven, making the "new" roof look like "its ribs were sticking out." According to Norman, you cannot just replace a few trusses because they are "married" to one another. He then explained how trusses are manufactured before they are installed. The trusses are meant to handle downward loads, not twisting as happened during Hurricane Laura.

Norman also explained that the doors of the hotel aged probably twenty years in twenty hours. He testified about damage to the lightweight concrete between the first and second floors. He addressed the damage to the HVAC system. He also addressed the exterior of the hotel. The windows, he explained, were no longer functioning. According to Norman, windows are rated for three types of energy: wind, water, and pressure. Hurricane Laura had all three. He recommended a total gut of the buildings. He concluded that the Days Inn was a total loss due to Hurricane Laura.

Next, Kermith Sonnier testified as Nanaki's expert in the field of public adjusting and contracting. Sonnier provided an estimate of damages dated April 29, 2023, which included Norman's recommendations about structural damages. Sonnier had extensive experience as a contractor and as an insurance adjuster, including working many catastrophic events. Although AmGuard spent time pointing to Sonnier's first estimate, which was dated March 20, 2023, Sonnier explained that that estimate did not include the structural damages identified by Norman.

Sonnier's final estimate provided as follows: his total estimate of damages to Building 1 was $3,340,943.10 and Building 2 was $2,359,557.13 (or $5,700,500.23 combined). The estimate included the costs of removal or demolition. It also included the costs to fix the structural damages. By contrast, Sonnier noted that AmGuard's estimate—which was Massaro's estimate of December 9, 2020—did not have any amounts for removal or demolition nor did it analyze or estimate the structural damages. In the end, Sonnier testified that the Days Inn was a total loss due to Hurricane Laura.

AmGuard called construction expert Dan Kessinger. Kessinger testified that he did not do what he was hired to do in this case and that he did not follow his

9

typical methodology: although he tried to compare Sonnier's final estimate with AmGuard's estimate, he admitted that Sonnier's final estimate was not included in his expert report. As such, Kessinger only provided a comparative analysis between AmGuard's estimate and Sonnier's first (preliminary) estimate.

*Mitigation/Removal Estimates*

In this case, the term "mitigation" was used in two different ways. First, mitigation was used to describe activities to preserve the hotel, such as the installation of a temporary roof. And second, it was used to describe removal and demolition: the part of the project where the materials are removed before rebuilding.

As between the parties, only Nanaki provided mitigation/removal estimates: Sonnier's estimate contained approximately $1,200,000.00 in mitigation costs; Nanaki adjuster Pinnacle estimated mitigation costs of $1,025,000.00; and Rainbow estimated $1,139,376.76 in mitigation.

Sonnier explained that any estimate of building damages must include the costs of removal. He further explained that mitigation companies use the term "demo." Xactimate, the pricing software for estimates, has codes for both. Yet AmGuard never estimated these costs. AmGuard adjuster Massaro testified that he was going to add an estimate for mitigation to his December 9, 2020 estimate but never did.

*BPP Estimates*

Nanaki provided the only estimates for BPP. On October 7, 2020, Pinnacle submitted an estimate of $353,633.82. Pinnacle updated that estimate on October 8, 2020, with $81,628.07 for mattresses. In contrast, Massaro testified that he had estimated the contents but never added this sum to his report.

We now turn our attention to AmGuard's assignments of error.

**AmGuard's First Assignment of Error**

AmGuard initially argues that the trial court erred in awarding Nanaki $1,139,376.76 for mitigation work that it did not perform, plus that same amount in penalties and fees. Nanaki, on the other hand, contends that this assignment should be summarily dismissed because the trial court did not award any damages for mitigation work. Although Nanaki is correct that the December 5, 2023 judgment did not award mitigation damages, our analysis does not end here.

At the time of Hurricane Laura, La.R.S. 22:1892 (2019) provided in relevant part:

> A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:1811, 1821, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest. The insurer shall notify the insurance producer of record of all such payments for property damage claims made in accordance with this Paragraph.
>
> . . . .
>
> B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4) of this Section, respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2) of this Section when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

Nanaki adjuster Rainbow estimated that it would cost $1,139,376.76 for removal of materials and demolition. With that in mind, Nanaki's argument for

summary dismissal ignores that these mitigation costs were built into Sonnier's estimate of building damages, which the trial court awarded as "Additional Structural Damages." The trial court then awarded bad faith penalties and fees for AmGuard's "arbitrary failure to timely pay structural damages[.]"

As a matter of law, penalties and fees cannot be assessed on amounts not owed. Penalties only arise when an insurer fails to pay "the amount of any claim due" and are calculated as fifty percent of "the amount found to be due from the insurer to the insured." La.R.S. 22:1892 (2019).

Here, mitigation costs are part of, not in addition to, the coverage for building damages under the policy. Nanaki's construction expert, Sonnier, acknowledged that his estimate of building damages included mitigation costs. The trial court, as noted above, used his estimate as the basis for its award of "Additional Structural Damages." Penalties and attorney fees were then awarded to Nanaki for AmGuard's untimely payment of building damages.

In sum, the trial court erred as a matter of law in awarding $569,688.38 in penalties and $569,688.38 in attorney fees for "bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay Mitigation damages[.]" The amounts should have been considered in its award of penalties and attorney fees for AmGuard's untimely payment of structural damages.

**AmGuard's Second Assignment of Error**

AmGuard next asserts that the trial court erred in awarding Nanaki full replacement cost value for building damages and BPP.

In support, AmGuard points to the policy language: "We will not pay on a replacement cost basis for any loss or damage . . . [u]ntil the lost or damaged property is actually repaired or replaced." The policy then limits replacement cost value to repairs or replacements "completed within one year from the date of loss or damages

12

or the issuance of applicable insurance proceeds, whichever is later, or as soon as reasonably possible thereafter." Otherwise, actual cash value is used, meaning replacement cost less depreciation.

According to AmGuard, there is no evidence that Nanaki replaced the damaged property. Hence, the trial court erred as a matter of law in awarding building coverage at replacement cost value and applying penalties and fees based on replacement costs estimates.

Nanaki disagrees, arguing that it could not repair or replace the damaged property due to AmGuard's significant underpayment of its claim. Nanaki notes that this exact issue was addressed in *Mason v. Shelter Mutual Insurance Co.*, 16-135 (La.App. 3 Cir. 12/28/16), 209 So.3d 860. There, this court determined that an insurance company could not, in bad faith, withhold funds and then claim the insured is limited to actual cash value rather than replacement costs.

Like *Mason*, neither party disputes that the property remains largely unrepaired or unreplaced. And like *Mason*, the trial court here found that AmGuard acted in bad faith by arbitrarily withholding coverage amounts. As the trial court put it:

> [I]t's clear the hotel is shut down . . . , and I think it's all due on how the claim was handled. And expecting Mr. Singh to get a hotel back up and running on very little money, it's always at the beginning of a[] catastrophe that you need help that you need the money. Two (2) years down the road hopefully it's all taken care of you don't need any money then because you got it when you needed it. But if you have to sit there and wait for it you will have to do like Mr. Singh did just close your doors.

In sum, the record evidence shows that Nanaki was unable to complete repairs or replace damaged property due to AmGuard's significant underpayment of the

claim. The trial court did not legally err by awarding replacement cost damages. Nor was its decision manifestly erroneous.[3]

**AmGuard's Third Assignment of Error**

In its third assignment of error, AmGuard contends that Nanaki failed to prove covered business income losses and that the trial court erred as a matter of law by disregarding the policy language.

"[D]amages for loss of profits may not be based on speculation and conjecture; however, such damages need be proven only within reasonable certainty. Broad latitude is given in proving lost profits because this element of damages is often difficult to prove and mathematical certainty or precision is not required." *Maloney Cinque, L.L.C. v. Pac. Ins. Co.*, 11-787, p. 18 (La.App. 4 Cir. 1/25/12), 89 So.3d 12, 25, *writs denied*, 12-950, 12-973 (La. 7/2/12), 92 So.3d 345 (citations omitted).

Trial courts are tasked as the gatekeepers and must carefully consider an expert's methodology. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993); *State v. Foret*, 628 So.2d 1116 (La.1993). In this role, trial courts are given great discretion, particularly in bench trials.

In a nutshell, AmGuard takes issue with the methodology of Robert Ehlers, Nanaki's expert, as it relates to 2020 income losses and the impact of COVID-19, as well as his failure to specify the actual loss for that period. The policy language provides for "actual loss of Business Income" during restoration. The policy defines business income as "Net Income (net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred[.]"

---

[3] AmGuard makes other arguments to support its second assignment. But these arguments are all based on the premise that Nanaki failed to provide sufficient evidence of the actual cash value of the damaged property. Hence, the arguments are moot based on the trial court's use of replacement cost value.

Nanaki notes that Engle Martin reported a potential business income loss of $400,000.00, and AmGuard's records in September 2020 stated that "[b]usiness income is expected to be significant due to the insured location being next to a casino." Ehlers is a respected CPA whose methodology was explained in detail in his trial deposition and accepted by the trial court. Importantly, his conclusions fall within the scope of loss recognized by both parties.

More precisely, Ehlers applied a formula of net income plus continuing expenses, minus revenue generated during the restoration period. The restoration period was calculated from August 30, 2020 through August 29, 2021, followed by an additional thirty days. Ehlers used four years of Days Inn historical data and tax information to calculate a contribution margin. He then calculated projected gross revenue, minus saved variable and fixed expenses to arrive at the projected business income loss of $218,480.00 in business interruption/loss for the period of restoration and $38,319.00 in extended business interruption.

Ehlers's methodology and conclusions were accepted by the trial court in calculating business income damages. His conclusions were also used as the basis for penalties.

In sum, the trial court did not disregard the policy language in calculating business income losses. Nor was the trial court clearly wrong in making these findings of fact. This assignment is without merit.

**AmGuard's Fourth Assignment of Error**

In this assignment, AmGuard asserts that the trial court erred in finding that it (AmGuard) received satisfactory proof of loss and acted in bad faith when the extent of damage was unknown, when it made reasonable efforts to obtain information and adjust the claim, and when Nanaki withheld information and submitted false and misleading information. We disagree.

"The party claiming entitlement to penalties and attorney fees for bad faith claims handling has the burden of proving: (1) the insurer received satisfactory proof of loss; (2) the insurer failed to pay the claim within the applicable statutory period; and (3) the insurer's failure to pay was arbitrary[.]" *Aghighi v. La. Citizens Prop. Ins. Corp.*, 12-1096, p. 4 (La.App. 4 Cir. 6/19/13), 119 So.3d 930, 933, *writ denied*, 13-1737 (La. 10/30/13), 124 So.3d 1102.

Satisfactory proof of loss is a flexible requirement to advise the insurer of the facts of the claim. *Sevier v. U.S. Fidelity & Guar. Co.*, 497 So.2d 1380 (La.1986). The requirement is that the insurer obtains sufficient information to act on the claim, regardless of how it obtains the information. *Id.*; *see also Louisiana Bag Co. Inc. v. Audubon Indem. Co.*, 08-453 (La. 12/2/08), 999 So. 2d 1104.

In a recent hurricane case, this court explained that "'[a] personal inspection of an insured's property by an adjuster for the insurance company also constitutes satisfactory proof of loss.'" *Guillory v. Louisiana Farm Bureau Cas. Ins. Co.*, 22-634, p. 10 (La.App. 3 Cir. 10/4/23), 371 So.3d 1202, 1211, *writ denied*, 23-1453 (La. 1/10/24), 376 So.3d 848 (quoting *J.R.A., Inc. v. Essex Ins. Co.*, 10-797, pp. 32–33 (La.App. 4 Cir. 5/27/11), 72 So.3d 862, 881). The statutory timeline starts from the initial inspection and not from any final report by the insurer. *Aghighi*, 119 So.3d 930.

Arbitrary, capricious, or without probable cause is synonymous with vexatious, and a vexatious refusal to pay means an unjustified refusal to pay. *Aghighi*, 119 So.3d 930. "The case law is clear, 'if part of a claim for property damage is not disputed, the failure of the insurer to pay the undisputed portion of the claim within the statutory delay will subject the insurer to penalties on the entire claim.'" *Id*. at 935 (quoting *Maloney Cinque*, 89 So.3d at 23).

Here, the day after the hurricane, on August 28, 2020, Nanaki filed its claim with AmGuard. On September 5, 2020, AmGuard's first adjuster, Engle Martin, inspected the damage to the Days Inn. Four days later, Engle Martin submitted a preliminary report to AmGuard with a final estimate of damages to be submitted within two weeks. But AmGuard fired Engle Martin before the submission of its final estimate.

AmGuard's Massaro took over the claim from Engle Martin on September 11, 2020. Massaro inspected the property on September 24, 2020, and October 14, 2020. Then, on October 23, 2020, Nanaki adjuster Pinnacle provided Massaro with an estimate of loss of $1,923,331.64 for Building 1 and $1,661,262.44 for Building 2 (or $3,584,594.08 for both buildings). Massaro, in turn, inspected the property for a final time on December 2, 2020. Thereafter, on December 9, 2020, Massaro emailed Pinnacle an estimate of damages styled "repair scope and summary." Massaro concluded that the net sum due Nanaki—not including prior payments— totaled $1,792,831.91.

Two months later, on February 23, 2021, Massaro provided Pinnacle with a formal proof of loss. Massaro estimated therein that the net sum due Nanaki was $1,764,243.97, not including sums previously advanced. There was even a note in AmGuard's claim file dated February 24, 2021, stating that the "undisputed" sum due Nanaki was $1,764,243.00. Yet AmGuard withheld these funds from Nanaki for several more months. Ultimately, the sum of $1,554,876.84 was paid to Nanaki on June 3, 2021. And the remaining sum of $209,367.12 was paid to Nanaki on September 15, 2021.

Put simply, AmGuard received satisfactory proof of loss when its adjuster Engle Martin inspected the Days Inn on September 5, 2020, and found substantial damages. But AmGuard also received satisfactory proof of loss on multiple other

occasions, including October 23, 2020, which is when Pinnacle provided Massaro with a 588-page estimate of loss. The trial court homed in on this event, stating that "[t]he notice of proof of loss . . . was submitted by Pinnacle to AmGuard back on October 23, 2020." The trial court found that this was the date that AmGuard received satisfactory proof of loss. In doing so, the trial court found that the first element of proof for statutory penalties was satisfied. The record supports this finding.

Now to the second element of proof: that AmGuard failed to pay the claim within the applicable thirty-day statutory period. The only monies that AmGuard paid timely for building coverage were the $100,000.00 advance on September 16, 2020, and the $162,506.73 advance on October 16, 2020. The only BPP paid timely was the $50,000.00 advance on October 15, 2020. And incredibly, for over six months, AmGuard withheld $1,764,243.97 in undisputed funds from Nanaki. This timeline is not disputed. Thus, the record supports the trial court's finding that the second element was satisfied.

Turning now to the third and final element of proof: that AmGuard's failure to pay was arbitrary. AmGuard withheld from Nanaki undisputed coverage amounts totaling $1,764,243.97 for six months. This is not disputed. And this, in and of itself, satisfies the third element of proof. Hence, the record supports the trial court's finding that the third element was satisfied.

In the end, the trial court found that "AmGuard dropped the ball in handling Nanaki's claim and that it [acted] arbitrarily and capriciously or without [probable] cause in violation of the statutes." The trial court rejected AmGuard's excuses for its failure to timely pay Nanaki's claim and imposed bad faith penalties under La.R.S. 22:1892. The trial court's findings of fact were not manifestly erroneous. AmGuard's fourth assignment is therefore without merit.

**AmGuard's Fifth Assignment of Error**

The judgment awards lost profits under La.R.S. 22:1973 (2012), which provides for consequential damages "as a result of" an insurer's bad faith conduct. In its final assignment, AmGuard makes two arguments against the trial court's award of consequential damages.

First, AmGuard argues that Nanaki's lost profits were not caused by AmGuard's conduct when Nanaki used almost none of the $2.5 million paid by AmGuard to restore the property. In response, Nanaki argues that its experts Sonnier and Norman put to rest any questions about how the insurance proceeds were used. Sonnier testified that there needs to be a comprehensive rebuild plan before using the funds. As an example, he pointed to the $66,000.00 roof replacement paid for with funds advanced from AmGuard. Because of the structural damage, the new roof will have to be removed and replaced. These funds were thus wasted, exemplifying the dilemma in which AmGuard placed Nanaki. Norman also explained at trial that you cannot "piecemeal" a building of this sort. Norman testified that you do not want to "start throwing money at this building" until you have all your damages and enough money to fix it.

The trial court found that the hotel was forced to shut down due to AmGuard's bad faith handling of Nanaki's insurance claim: it was impossible for Nanaki to repair the hotel due to AmGuard's significant underpayment of the claim. The trial court's finding as to causation—that AmGuard's bad faith conduct caused the lost profits—is reasonably supported by the record.

AmGuard's second argument against consequential damages is that Nanaki failed to prove its lost profits with reasonable certainty. More specifically, AmGuard notes that Nanaki's expert CPA, Ehlers, failed to deduct "fixed" expenses that Nanaki would have needed to incur to generate income. AmGuard contends that this

was an error of law, citing *Morton M. Goldberg Auction Galleries, Inc. v. Canco, Inc.*, 94-734 (La.App. 4 Cir. 1/31/1995), 650 So.2d 801. There, the fourth circuit observed that "[t]he jurisprudence addressing business interruption losses has established two rules, application of which depends on whether the business continues to operate following the incident in question." *Id.* at 804. When a business ceases operation, as here, fixed costs must be deducted from projected revenue and thus removed from lost profits. *Id.* "Deduction for fixed costs is appropriate when the firm ceases operation following the delict because it has not incurred those costs. If the court were not to deduct fixed costs, the plaintiff would receive a double recovery." *Id.* at 805. We agree.

The trial court here erred as a matter of law in failing to deduct fixed costs. The trial court calculated lost profits of $1,116,546.00 for a period of 15.07 months (September 29, 2021, through December 31, 2022). Yet based on our review of the record, the fixed costs during this period would have totaled $500,590.24.[4] Hence, the deduction of fixed costs results in lost profits of $615,955.76 (not $1,116,546.00).

AmGuard also complains that the calculation of lost profits is based on erroneous occupancy projections. We disagree. The trial court acted within its discretion in using the occupancy projections given by Ehlers.

### DISPOSITION

The trial court judgment of December 5, 2023, is reversed in part to the extent that it awarded Nanaki LLC $569,688.38 in penalties and $569,688.38 in attorney fees for AmGuard Insurance Company's "bad faith under La. R.S. 22:1892 for arbitrary failure to timely pay Mitigation damages[.]"

---

[4] The fixed costs used for this calculation are taken from Ehlers's Report of Consequential Damages dated March 27, 2023, specifically from the schedule styled Trend Analysis and Historical Income Statement Statistics.

The judgment of December 5, 2023, is amended to reflect consequential damages of $615,955.76.

The judgment is also amended to reflect TOTAL damages, penalties, and attorney fees owed to Nanaki LLC in the amount of $8,009,876.94 (not $9,649,843.94).

The judgment is affirmed in all other respects.

The costs of this appeal are assessed as follows: one-half to AmGuard Insurance Company and one-half to Nanaki LLC.

**REVERSED IN PART;**
**AFFIRMED AS AMENDED.**